I've been setting up, I'll go ahead and call the cases. And you can come up whenever you're ready. These are case numbers 22-10572 and 22-10618, United States versus Attis and Lillow. And you're going to divide your time, right? Ms. Lowenthal and Mr. Suma, you're going to do six and two? Yes. And then Mr. Suma is going to do five and two, right? Ms. Lowenthal, we know you're court appointed and we want to thank you for your service over the years and certainly in this case as well. We do appreciate it. Thank you, Your Honor. Good morning. May it please the court. My name is Cheryl Lowenthal and I am CJA appointed counsel for Rasheem Attis. This is a matter where the standard of review is abuse of discretion but also de novo review on the facts. And I would submit that the facts in this case are somewhat peculiar in that in any ordinary traffic stop, I would submit that the person in the car, the driver particularly and a passenger, which my client was the passenger, is going to be nervous and upset and afraid. I know that I would if I were stopped for a traffic infraction. And you have these two gentlemen and they ask, and at the motion to suppress hearing, the officer, Deputy Dasher, is asked, well, why did you stop this car? And he said, well, it was a gray Honda and it had a tag that was, that came back as a rental car and it had dark tinted windows that he, in his observation, were too dark and against Florida law. So he pulled them over. He also said the car was speeding? And they were speeding. Yes, they were speeding. He's approximated between 80 and 90 miles an hour. And he said that it appeared... And was... Yes, sir. And was also driving evasively past the truck on the right lane when that hit? Didn't he also say the car was driving evasively when he tried to follow it? Well, the police car was behind the car carrying Mr. Addis and Mr. Leleau, and Mr. Leleau was in the middle lane and passed. It was my understanding from reading this, and I just read these motions to suppress transcript again last night to refresh my memory, but it appeared that the 18-wheeler was on the right-hand side, Mr. Leleau was in the middle lane, and that the officer was in the left-hand lane, and that he went fast just to get around it. And I can remember when I was learning to drive and I would be, you know, on a highway, my father would tell me, just hit the gas and get around them when you're going one of those... Putting that... Putting... Putting your driving instructions aside for the moment. He passed on the side that you usually don't pass on, and the officer gave us one of several reasons for stopping him. I'm not sure that he needed anything other than the high rate of speed he was traveling, but he gave us one of the reasons that he drove evasively when the officer was following him. Did he not? That is what the officer testified to, yes, Your Honor. Okay. And in any event, so when they did stop, the officer got out of his car and he asked Mr. Leleau to get out of his car, and they talked outside the car, and at one point the officer said, well, he appeared nervous. Well, I think anybody would be nervous. And then he appeared kind of, like, sweating, and it was June between Ocala and Gainesville. I mean, in June, it's going to be hot, and I guess a person could expect it to be sweaty. Counsel, haven't we held in a number of cases that an experienced law enforcement officer's can be considered in determining reasonable suspicion either to continue or even probable cause? Yes. Yes, Your Honor. It has been held in this court and other courts, but, you know, maybe it's time to kind of rethink how these things work, because that's how anybody, I think, would react. And then, of course, it was a rental car, and he was asked for the rental contract. He couldn't produce it immediately, and the officer could have called. He knew the rental car company was Enterprise. He could have called to confirm that these people were authored, that, well, Mr. The driver was authorized to be driving that car and in possession of that car, but he didn't do that. And then he began to ask further questions about, well, what's in the car? Do you have drugs in the car? Do you have a lot of money in the car? And he kept asking questions and extended it. And he said he was just going to write a warning for speeding. And in the time that he could have just gotten that warning written and signed and given to the driver and they could have been on their way, he kept asking more and more questions in a fishing expedition to ask about drugs and other illegal activity. Now, it also was stated at trial by at the motions of suppress hearing by Deputy Dasher that this is, that I-75, and in this particular area, Central Florida, it is used by people who are committing criminal activity. Well, it's also used by a whole lot of people who aren't, including myself. I've driven that strip of road. And then they said, well, and it's a, there's a lot of drug activity. Yes, Your Honor, there's a lot of drug activity that goes on I-75 in that area. And then, but these people had no drugs. Well, they had one marijuana, they had one cigarette that appeared to be maybe marijuana. It was never tested. Again, there was some factual discrepancy. The second officer arrived on scene after the time that a reasonable stop was. When do you think that stop should have ended? It should have been, it could have been, it could and should have been concluded, a warning written, which is what Officer Dasher said he was going to give them. And they could have been on their way before the corporal. He had, you, let me not put words in your mouth. Do you agree or concede that the officer could have lawfully continued to stop to check whether or not they were validly driving that car once he got the rental agreement that was a mismatch? Absolutely. And that would have just been by a, just a phone call to Enterprise Leasing would have determined whether or not these folks were authorized to be in that particular automobile. And furthermore, the fact that the windows were tinted and the officer said that people rent a car and then take it and get the windows tinted so that nobody can see inside if they have drugs. So, counsel, you, you would have us require police officers who are on the side of a busy interstate trying to ascertain if these people have valid authority and asking questions we've held in the past, they can validly ask. You would have us impose a rule that they've got to investigate over the telephone and track down any leads rather than continuing to ask questions. Well, not a rule, your honor. It's a fact-based matter in a, in, you know, given a particular case, particular circumstances. Yes, but if, if we fault the officers for not being that, doing that, it'll be a rule. Why? You, you're, you're correct, your honor. But and the other, and the other, the other thing that I find so peculiar about this was when Corporal Davis arrived on the scene, and these were both, by the way, canine officers who had canines apparently in their SUVs, and neither of them dispatched the canines because Corporal Davis stated first, she stated on the, whatever, whatever, if it was a dash cam or a, a body cam video, she stated that she smelled green marijuana. But then when she approached the car on the passenger side, she said she smelled smoked marijuana. She changed her testimony that it was smoked marijuana that she smelled, but that's not what she said on the dash cam when she had first arrived on the scene. And indeed, there was a, some sort of a smoke, a cigar-like thing in the car that had green material in it that was never identified actually as marijuana. It smelled, she said, like marijuana. Deputy Dasher said he couldn't smell because he had allergies and was taking medication for the allergies, so his, his olfactory senses were diminished. There are just so many strange facts about this, about this stop that I would submit that the motion to suppress should have been granted, and, oh, and, and, and, and the one final thing is that there were no drugs in the car. What they found was some cash, about 29, $39,000 in cash, which that could be illegal activity. And the second thing was fraudulent cards, financial cards from fraudulent employment, unemployment claims made that were related to the COVID pandemic. And so there was some fraud. And when they asked it, when the deputy was asked at the motion to suppress, and what kind of criminal activity, you know, do you see on I-75, he said drugs. And then they said, well, do you also see fraudulent activity? And he said, oh, yes, of course. And I'm wondering how many cars they ever stopped where they found a couple of hundred of these fraudulent and, and fraudulently identified use of other person's identity to, to make claims for unemployment compensation during the pandemic. And it's, it, the whole thing is just strange. And I, I submit that that motion to suppress should have been granted. Thank you. Thank you very much. May it please the Court. I'm Richard Suma for Pierre Lallot. So, this appeal turns on whether the stop was extended longer than necessary to effectuate the purposes of the stop. And here we have an officer, Dasher, who had a lot of suspicions, and some of them may have been reasonable. But this officer had little desire to dispel those suspicions in an expeditious manner, at least not until the K-9 unit arrived. Here, the, the law requires that the, the extra investigation of criminal activity be tailored to its purpose, limited in scope and duration. The officer should employ the least intrusive means available to dispel the suspicions. So in, to address Judge Karn's comment about what the rule imposes, the Supreme Court has already imposed the rule. The extra time must be done in an expeditious manner. And it is quite common for law enforcement to place calls to the rental company. I cited cases in my brief where it's common for police to do that, and the officer certainly should have done that in, in this case. And the cases, counsel, the cases you have cited actually say it's quite common for law enforcement to just find cases where they've done that. I'm relying on cases where I've noted that they've done that and have seemed to be no particular inconvenience for the officer. So in here, I think one of the most, officer's most reasonable inquiries was whether the car may have been stolen or whether the drivers had authority to use the car. But remember, he already had run the tag on the vehicle before he stopped the car. So it was, that would normally show if the vehicle had been stolen. So to begin with, there was a low probability that the car was stolen. But then when he got a chance to see the rental agreement, there was another problem. I can see that. And that justified an inquiry, and I'm not challenging that. But the inquiry should have been to call the rental company. He would have gotten his answer on whether that car was stolen. And not only that, that call would have addressed his other, I would say, legitimate concern about the window tinting. You know, if he called the enterprise people, he might have been able to ascertain whether that car had tinted windows when it was given out to Mr. Lalo. I mean, these are the most expeditious manners. Anything about the ultimate question? Sorry, did the record say anything at all about that ultimate question of the tinting? I think it's fair, yes, yes. I think the, there was a question that ultimately, the window was tinted too darkly. But the test was only done until after the arrest. No, no, but who tinted it? Enterprise rented the car with tinted windows? There's nothing in the record about that. But that would have been appropriate to discuss, and that would have been legitimate to show. I mean, the officers know, and I accept that. I accept the proposition that the officers know that a tinted window on a rental car may indicate criminal activity. But if criminals do that, then, you know, the rental cars are turned over a lot. So, so a person may rent the car, and it may already have tinted window if the rental company doesn't take the trouble to remove it. Counsel, let me ask you this. What is the evidence in the record that Enterprise would have confirmed these were the actual renters? That these guys had the, the driver actually had the rental agreement with Enterprise? Whether, whether Enterprise would have confirmed that or not is not in the record because the officer never made the call. Yeah, and apparently the defense counsel at the motion to this press had never made the call either, correct? Right, but the government had the burden. So as far as, so as far as this record indicates, Enterprise would have said we've never heard of these people. Yeah, but the government had the burden on the motion to suppress to show that the stop was lawful and that the extended period of time of the stop was also lawful. I'll come back if there are no further questions. Right, thank you very much. Robert Davies, U.S. Attorney Good morning. May it please the Court. Robert Davies for the United States. Your Honor, Deputy Dasher conducted a valid traffic stop from the time he stopped the car up until the rental agreement was produced. And at the time the rental agreement was produced, Dasher had reasonable suspicion of criminal activity to continue to detain the defendants. The rental agreement that was produced was produced on the phone and the initial rental agreement, correct me if I'm wrong, I thought the initial rental agreement that was produced, the officer said was for a different car. It was produced on a phone and it was for a different car. This was a gray Kona and the rental agreement that was produced was for a red Nissan. It was also for a different time period. The stop was on June 25th, 2020 and the rental agreement that was on the phone was for a red Nissan that was rented on May 27th and was supposed to be returned by May 30th, over three weeks before. And that's one of nine factors the district court cited giving Officer Deputy Dasher reasonable suspicion to continue the investigation. To go back to our questions for Mr. Suma, was there any evidence presented at the suppression hearing, one way or the other? About whether Mr. Addis and Mr. Lowe were violently in possession of the Kona. There was not. The evidence was that they were driving a gray Kona on June 25th. The answer to your question is no, just it may help you a little bit to know, the evidence was that they were driving a gray Kona on June 25th. The rental agreement was for a red Nissan that was rented from May 27th to May 30th. Okay, the last sort of slice of that question, was there any evidence presented at the suppression hearing that the Kona was stolen? No. So, it's just a big question mark. Yes, and Deputy Dasher did ask a little bit about that, a little bit. He said, you know, if they hadn't, if Deputy Corporal Davis hadn't come and smelled the marijuana, then he would have seen if the car was validly rented, but he didn't get to that because they searched the car and found the evidence of identity theft. And also, in his incident report, which is in the record, Defense Exhibit 1, page 8, it says the car was ultimately towed by elite towing and Deputy Dasher contacted Enterprise Rental Company for retrieval of the Kona. That's all the evidence about that. Your Honor, on the reasonable secession point, it's not just the fact that he was driving a stolen, that he was driving a rental car that didn't match the rental agreement. There's nine other factors. There's the fact that the windows were heavily tinted, which an experienced officer, Deputy Dasher, knew indicated possible criminal activity. There's the erratic driving. There's the fact that when they were stopped, he gave a suspicious explanation saying he was claustrophobic when he wasn't even boxed in, and plus they're on an interstate. They were coming from a city, Mission, Texas, that Dasher knew was a source city for illegal drugs. They were on a turnaround trip from South Florida, from Texas to South Florida. They gave inconsistent stories about where they had been in Texas. When Dasher asked for the, if he had, how long, when Dasher asked when he had rented the car before he pulled up the rental agreement, when Dasher asked Lelew when he had rented the car, Lelew paused, and if you watch the video, he paused and he hesitates and says, a week or two before, or it might be a week or so before. So that's another factor. Also, he was acting nervously at that time, and the district court credited the testimony. He was acting nervously. You've got the law on your side on this point, but to play devil's advocate, almost every city in the United States is a transshipment point for drugs these days, right? Not as bad as Mission, Texas. Unless you find a small rural town with a population of 50. I mean, every major metropolitan area on a highway in the United States expressway system is a transshipment point for drugs. I don't disagree with that, Your Honor. Mission, Texas, though, is a pretty well-known, I mean, that's, I mean, that's fair to say that's, some cities are bigger source cities than others, and I think Mission, Texas falls in that category. Counsel, I would have thought your answer is that's probably why the district court disregarded it. Right, the district court didn't give that significant weight. And I would just point out, just as a small aside here, the district court did not give weight to the fact that they were on I-75, which there was testimony it was a drug coroner. But in the Menendez case, which this court decided, it is an unpublished decision, but this court noted that I-75 was a drug corridor, and that was a factor it used in affirming the district court in the Menendez case. But that's just an aside. You've got all these factors. There was reasonable suspicion, and there was reasonable suspicion to go beyond the rental agreement and to see if criminal activity was afoot. Now, let me ask you this question. So let's, we have to not only decide this case, but we have to figure out a rule that decides the case. And so in the spirit of that, let me ask you this question. Yes, sir. If the concern after the stop was no longer the speeding or the erratic driving, but the tinted windows, right, and the incorrect rental agreement for a car that wasn't there, how does an officer go about constitutionally deciding whether or not he's got to investigate further or whether his suspicions really don't have a basis in fact? Like, what should we, what should anyone expect an officer to do in that circumstance? He's got a car that's not on the rental agreement for a time period not in the rental agreement, and the car's got tinted windows. So what do we expect him to do to ease his concern about those facts? I think pretty much what happened here, that the officer, they have these license plate reader checks, which is explained in the record. They're finding where the car's been by running the license plate through a computer system to see where it's been. That can give you some information. Then just asking some further questions, like happened here. He asked Lalu when they left Mission, Texas, did you get tired when you were driving? Just trying to flesh it out and develop, see if something comes up. And you can do that for a few minutes. You can't do it for a long, you know, you can't do it for a long time. But here you're talking about 12 minutes when he was investigating, and he kept having his suspicions raised. And then as that was going on, as luck would have it, Officer Davis, Corporal Davis showed up and smelled the marijuana, which Deputy Dasher couldn't smell because of his allergies. But I think it's just, the vague answer to your question, not completely vague, but the answer to your question is it's got to be reasonable. These officers are experienced officers. They're just trying to gather more information and see if their suspicions get raised. And that goes all the way back to Terry. I mean, Terry versus Ohio. You had an experienced police officer who saw stuff that was suspicious, and he acted on it and investigated it some. And that's ultimately the answer to your question, I think, Judge Shorten. Of course, in this case, again, you've got more facts than that, more reasonable suspicion than that. With regard to Mr. Summa's argument about the Terry stop was so unreasonably long that it violated the defendant's Fourth Amendment rights, that's simply not the case here. This was a valid Terry stop. It was 12 minutes long from the time of the rental agreement to the marijuana. So let me ask you a hypothetical. So if Mr. Leleu had had a valid rental agreement and he had had it in his glove compartment, he reached over, gave him, Deputy Dasher, the rental agreement, and checked out, would that have been sufficient then to end the stop, or would the tinted windows have been a further concern? That's obviously a closer case, Your Honor, but I think there would still be reasonable suspicion in this case, because you've got the judge, the district court went through nine factors, and the rental agreement being wrong was just one of those nine. I think if you add up all the factors, even if the rental agreement had been okay, there would have been reasonable suspicion for a, to continue at the Terry detention here and investigate further. But of course, you don't have to, of course, that's not this case, but I understand it's hypothetical. But I think you would have had a reasonable suspicion with even, even without the rental agreement coming back the way it did. The Terry stop wasn't so long that it became an arrest, an illegal arrest. You don't, I have a plain argument on this. This argument was not raised in the district court. It is plain error review, but you don't even need to get to that because there was no error at all. You've got the four non-exhaust. Are you discussing now saying there was no error on? What I'm, what I labeled issue 1C in my brief, which is Mr. Summa's primary argument, the only argument he raised here, an oral argument, which is that the Terry stop was so long that it was, that it violated the Fourth Amendment, and in effect that the Terry stop became an arrest. That argument wasn't raised in the district court, and I cite the case law in my briefs that plain error reviews of review applies if a specific argument's not raised clearly in the district court. And there wasn't plain error, but there wasn't error at all. I mean, whether this Terry stop became an illegal arrest, you've got the four non-exhaustive factors in Street and Acosta, and all four of them weigh in the government's favor, and I go through that in my brief. So that's not a problem for the government either. The last thing I would like to address is the marijuana. Ms. Lowenthal said there was some dispute in the record between green marijuana and burnt marijuana. I think there is mention of green marijuana somewhere in the record, but Corporal Davis, I'm sorry, yeah, Corporal Davis specifically testified that she smelled burnt marijuana, and that's at page 103 of the suppression hearing. And I think elsewhere, either on the video or maybe in the police report, there's some mention of green marijuana. I think she says she made a mistake and that it was burnt marijuana. But regardless, there's testimony in the record at page 103 that she smelled burnt marijuana, and the district court credited that testimony in taking the facts in the light most favorable to the government, as you do since we're the prevailing party in this case. She smelled burnt marijuana, and under the case law, that gave probable cause for the search. Unless the court has any other further questions, I'll rest on my brief for the rest. All right, thank you very much. Thank you. Couple of minutes. My colleague submits that there are more than enough facts to support the suspicion and the continuation of the questioning. I would submit that there are a lot of facts that are in dispute, and a lot of facts that are, a lot of questions that remain unanswered that were very crucial to this stock. First of all, it was on the video where Corporal Davis said that she smelled green marijuana. When she testified at the suppression hearing, she said she smelled burned marijuana. Then she said she made a mistake. It would seem that when she's at the scene, it would be, her impression would be more. But isn't that, unfortunately, for your position, subject to clear error review? No, because nobody actually said what it was. It could have been hemp, which smells pretty much the same, and is legal in Florida as of the time of this stop. Additionally, that question about- Wait, wait, wait, wait. I'm sorry, I don't understand that. I understood Judge Jordan's question to be whether she smelled green or burnt marijuana is a fact finding, and that's subject to clearly erroneous review, is it not? I thought the facts were subject to de novo review, but perhaps I am- No, they're not. Trust me. Oh, all right. I would trust you, yes. Thank you for correcting me. The question about the tint on those windows, did Enterprise give them a car with tinted windows? Did Enterprise tint the windows? Did some previous person who rented the car tint the windows? Or did these fellows take this rental car and have the windows- Nobody knows about those tinted windows and whether they requested them or made them. But isn't that a problem for you? Because as the record stands now, those are big question marks, which lead to, one would think, reasonable suspicion that something is going on. Well, it would think that it's the government's burden to prove and- Oh, not to prove guilt. It's to prove reasonable suspicion. Reasonable suspicion. You are correct, Judge Jordan. And again, oh, and the other question about whether that they gave inconsistent answers about where they were coming from. If they came from Mission, Texas, they were both correct. You have to drive from Mission to Houston. They stopped in Houston and they visited some- One of them visited some relatives and they did some shopping. So they were both correct answers. So those were not inconsistent, I would submit. And again, we'd ask to reverse. Thank you. Thank you very much. Thank you, Judge Jordan. You asked the question, what do we expect the officer to do? And of course, I already said, call Enterprise. And the officer didn't do that. But my friend, Mr. Davies, said the stop was also extended by time investigating or examining a license plate reader or tracker. And I would note that that investigation was not probative of the best reasons the officer had for extending the length of the stop, which is whether the vehicle was stolen, whether the tinting of the windows. And that's why the plate reader tells the officer that the car has been in different places than the occupants are telling him.  Well, that heightens the suspicion, but not as to the reasons why the officer would have been justified to extend the stop, which is whether the vehicle was stolen and who. And you're lying to the officer, or potentially lying to the officer, about where you're coming from. Doesn't that send up alarm bells? Well, it does, but is that enough to justify the extent of the extended stop? But the issue is that most people don't know that the police can do a license tracker. And so they're telling a story. The officer can now, has the technology to actually assess whether or not what you're saying is accurate. And if he or she sees it is not, in fact, accurate, does that not allow them then to do further questioning? Sure, it allows them to do further things. And to whether they were engaged in criminal activity, it still doesn't go to the reason about the window tinting. Now, the officer had a reasonable time to investigate the speeding and the window tinting. And if he wanted to go other places, the most logical and the most expeditious way of doing that would have been calling Enterprise. Thank you very much. Are there any other questions? I'll sit down. Thank you very much. Okay, thank you.